# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| DIRECT ENERGY BUSINESS, LLC<br>1001 Liberty Ave., Suite 1200<br>Pittsburgh, Pennsylvania 15222<br><br>    *Plaintiff*,<br><br>v.<br><br>DUKE ENERGY OHIO, INC.<br>c/o CT Corporation Systems<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219,<br><br>    *Defendant*. | Case No. 1:21-CV-310<br><br>Judge:<br><br>Magistrate Judge: |

## **COMPLAINT**

This case arises from an electric utility's failure to report accurate consumption data to the regional transmission organization responsible for settling wholesale electricity transactions. The utility's unexcused error forced a market participant to pay over $1.6 million for energy used by *other* market participants' customers. The affected market participant, Direct Energy Business, LLC, for its complaint against Duke Energy Ohio, Inc., alleges and avers as follows:

### **Parties and Jurisdiction**

1. Plaintiff Direct Energy Business, LLC is a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania.

2. Defendant Duke Energy Ohio, Inc. is an Ohio corporation with its principal place of business in Cincinnati, Ohio, which is located in the Southern District of Ohio. Accordingly, this Court has personal jurisdiction over Defendant.

3. The parties being diverse for jurisdictional purposes, this Court has subject matter jurisdiction over this dispute under 28 U.S.C. §1332(a)(1).

4. Venue in this Court is proper under 28 USC §1391(b)(1).

## Background

5. Plaintiff incorporates by reference the allegations in paragraphs 1 through 4 of this Complaint.

6. Defendant is an "electric light company" and "public utility" under Ohio Rev. Code §§ 4905.02 and 4905.03 and subject to the general supervision of the Public Utilities Commission of Ohio (PUCO). Defendant has the exclusive right and obligation to furnish electric *distribution* service to all electric load centers within a certified territory determined by the PUCO. *See* R.C. 4933.83 *et seq.*

7. Defendant also supplies electric *generation* service under a "standard service offer," but Defendant does not have the exclusive right to supply generation service. Ohio law permits retail competition in the market for electric generation service. Entities licensed by the PUCO as "competitive retail electric suppliers" (CRES) may supply generation service to consumers in Defendant's certified territory. *See* R.C. 4928.08(B).

8. Plaintiff is a CRES supplier. Plaintiff procures electric generation service from a wholesale market administered by PJM Interconnection, LLC (PJM), a regional transmission organization subject to Federal Energy Regulatory Commission (FERC) jurisdiction. *See generally* 18 CFR § 35.34 (defining functions and characteristics of regional transmission organizations). The energy so procured is transmitted to a delivery point within Defendant's certified territory. Defendant then distributes the energy to Plaintiff's customers.

9. Plaintiff's customers for generation service are also customers of Defendant for distribution service. Defendant, like Plaintiff, procures energy needed to serve standard service offer customers from the PJM wholesale market. This arrangement requires a high degree of coordination between Plaintiff and Defendant to properly settle wholesale transactions and properly bill retail customers.

10. Plaintiff and Defendant are parties to a Certified Supplier Agreement dated September 3, 2010, a true and accurate copy of which is attached as Exhibit A (Supplier Agreement).[1] In executing the Supplier Agreement, "The Parties acknowledge their responsibility to cooperate with each other to assure that Certified Supplier's End-use Customers receive reliable electric energy service." Exhibit A at 3, Article VIII.

11. The Supplier Agreement generally describes the parties' respective duties in coordinating for the delivery of electricity to Plaintiff's customers. These duties include the duty to comply with Defendant's Certified Supplier Tariff, P.U.C.O. Electric No. 20 (Supplier Tariff). A true and accurate copy of the Supplier Tariff is attached as Exhibit B.[2]

12. Defendant's responsibilities under the Supplier Tariff include tracking and reporting hourly load data to PJM. PJM uses this data to settle wholesale transactions between and among electric utilities (such as Defendant), suppliers (such as Plaintiff), and generation

---

[1] An affiliate, Direct Energy Services, LLC, executed the Supplier Agreement on behalf of Plaintiff.

[2] Exhibit B is the version of the Supplier Tariff in effect during the relevant time period. The version currently in effect is available on the PUCO website at
https://www.puco.ohio.gov/emplibrary/files/docketing/tariffs/Electric/Duke%20Energy%20Ohio/PUCO%2020%20Certified%20Supplier.pdf.pdf

owners who sell electricity into the wholesale market administered by PJM. PJM issues weekly and monthly invoices to market participants to effectuate these settlements.[3]

13. CRES suppliers are not permitted to meter their customers' electricity consumption. All consumption is metered by Defendant. As both a legal and a practical matter, Plaintiff and PJM must rely on Defendant's meter data to accurately settle wholesale transactions and to ensure that retail customers are properly billed.

### Facts Giving Rise to Claim for Relief

14. Plaintiff incorporates by reference the allegations in paragraphs 1 through 13 of this Complaint.

15. Under Section 9.2 of the Supplier Tariff, Defendant has the exclusive right and obligation to "own, furnish, install, program, calibrate, test, and maintain all meters and associated equipment used for retail billing and settlement purposes in the Company's service area."

16. Prior to January 2013, SunCoke, a large industrial facility in Middletown, Ohio, received electric generation service from Defendant. SunCoke also generated electricity. The metering configuration at SunCoke did not automatically "net" monthly generation and consumption, so Defendant had to perform these calculations manually in order to render accurate bills to SunCoke and accurate load data to PJM.

17. In January 2013, Plaintiff began supplying electric generation service to SunCoke. Defendant remained responsible for metering SunCoke's usage, as well as reporting hourly load data to PJM reflecting the usage of all Plaintiff's customers within Defendant's service territory.

---

[3] PJM's activities are governed by its Open-Access Transmission Tariff (OATT). All market participants operating within the PJM region are subject to the terms and conditions of the OATT. The OATT exceeds 3,600 pages, but is available online at https://www.pjm.com/directory/merged-tariffs/oatt.pdf

4

18. The first PJM invoice Plaintiff received after SunCoke became Plaintiff's customer indicated that Plaintiff's customers in Defendant's service territory had nearly doubled their energy consumption. When Plaintiff questioned Defendant about the accuracy of this metering data, Defendant denied there was a problem.

19. After the anomalous PJM invoices persisted for several months, Defendant eventually admitted there was a problem: when SunCoke switched to Plaintiff for electric generation service, Defendant ceased performing the manual calculation necessary to net SunCoke's electricity production and consumption. As a consequence, Defendant reported far more usage to PJM than SunCoke was actually consuming. During the January 2013 billing period, for example, SunCoke consumed approximately 3,900 MWh of electricity, but Defendant reported to PJM that the customer had consumed over 26,000 MWh.

20. Defendant has exclusive control of the meters that measure customer usage throughout Defendant's service territory. Thus, PJM did not know, and could not have known, that the hourly load data reported by Defendant to PJM was inaccurate.

21. Defendant also provided electronic data to Plaintiff showing the electricity consumption of each of Plaintiff's customers. This data showed the net amount of electricity consumed by SunCoke; *i.e.,* the correct amount for retail billing purposes. Thus, initially, Plaintiff had no reason to suspect that Defendant was providing different, incorrect consumption data to PJM.

22. As a consequence of Defendant providing inaccurate information to PJM, PJM billed Plaintiff for electricity that was not delivered to or used by Plaintiff's customers. Nevertheless, the OATT required Plaintiff to pay PJM's bills upon receipt, subject to the "resettlement" provisions of the OATT.

23. Plaintiff was able to partially mitigate its damages through a "resettlement" provision specified in the OATT. PJM reversed and credited the excess wholesale deliveries included in the invoices for March through July 2013.

24. PJM's tariff contains a strict 60-day deadline for initiating resettlements. Defendant's delay in acknowledging the problem it had created foreclosed Plaintiff from resettling the January or February 2013 invoices. These invoices included excess wholesale energy charges of approximately $1.6 million. True and accurate copies of these invoices are attached as Exhibit C.

25. Plaintiff's attempt to mitigate its damages through the PJM resettlement process exhausted Plaintiff's administrative remedies. Further attempts by Plaintiff to appeal PJM's decision to FERC would have been futile. *See Strategic Energy, LLC v. W. Massachusetts Elec. Co.*, 529 F. Supp. 2d 226, 231 (D. Mass. 2008).

26. In July 2014, Plaintiff filed a complaint against Defendant with the PUCO. The complaint, docketed as PUCO Case No. 14-1277-EL-CSS, alleged (among other things) that Defendant violated the Supplier Tariff by furnishing erroneous load data to PJM.[4]

27. Plaintiff prevailed in the PUCO action. In an Opinion and Order dated April 10, 2019, the PUCO found that Duke violated the Supplier Tariff.

28. Duke appealed the PUCO's decision. On September 17, 2020, the Supreme Court of Ohio issued an opinion reversing the PUCO order and remanding the case to the PUCO with orders to dismiss Plaintiff's complaint "for lack of jurisdiction." *In re Complaint of Direct*

---

[4] The PUCO docket is accessible at http://dis.puc.state.oh.us/CaseRecord.aspx?CaseNo=14-1277&x=16&y=16.

*Energy Business, L.L.C. v. Duke Energy Ohio, Inc.*, Slip Opinion No. 2020-Ohio-4429 at ¶ 26 (Sep. 17, 2020).

### Count I: Breach of Contract

29. Plaintiff incorporates by reference the allegations in paragraphs 1 through 28 of this Complaint.

30. The Supplier Agreement is a contract. Defendant undertook a duty to perform the obligations specified therein.

31. Defendant's duties under the Supplier Agreement include compliance with the Supplier Tariff, as the terms of the Supplier Tariff "are merged and incorporated into this [Supplier] Agreement." Exhibit A at 9, Article XIX.

32. The first two sentences of Section 14.1 of the Supplier Tariff provide:

> The Company, acting as the designated Meter Data Management Agent for the Certified Supplier, will supply hourly load data to Transmission Provider, for the Certified Supplier. The Company will provide this data in accordance with the OATT, including estimates when necessary.

33. Although the Supplier Agreement does not expressly state that hourly load data furnished to PJM must be "accurate," a requirement for accuracy is an essential term of the contract.

34. Defendant did not provide accurate load data to PJM during the period January 1, 2013 through June 30, 2013.

35. Defendant's initial denials of knowledge or responsibility for the billing issues relating to SunCoke, as well as Defendant's delay in remedying these issues, violated the duty of cooperation set forth in Article VIII of the Supplier Agreement.

36. Defendant's acts and omissions constitute breach of the Supplier Agreement.

37. At all times relevant to the Complaint, Plaintiff performed its obligations under the Supplier Agreement.

38. Plaintiff has been damaged by Defendant's breach of the Supplier Agreement.

## Count II: Negligence

39. Plaintiff incorporates by reference the allegations in paragraphs 1 through 38 of this Complaint.

40. As a Load Serving Entity within PJM, Defendant is subject to certain duties mandated by the PJM OATT. These duties arise independently of Defendant's contractual obligations under the Supplier Agreement.

41. Defendant's Supplier Tariff also imposes duties upon Defendant that arise independently of Defendant's contractual duties under the Supplier Agreement.

42. Through the acts and omissions alleged herein, Defendant failed to exercise ordinary or reasonable care in the performance of duties arising under the OATT and Supplier Tariff.

43. Plaintiff has sustained damages as a result of Defendant's negligence.

## Count III: Negligent Misrepresentation

44. Plaintiff incorporates by reference the allegations in paragraphs 1 through 43 of this Complaint.

45. Defendant had actual knowledge that the metering configuration at SunCoke required a manual netting of energy production and consumption in order to properly settle wholesale energy transactions and render accurate bills to SunCoke.

46. The facts and circumstances regarding the need to "net" energy production and consumption were material to Plaintiff's supply of energy to SunCoke. Defendant had a duty to disclose these material facts to Plaintiff

47. Defendant failed to exercise reasonable care to disclose facts material to the supply of energy to SunCoke.

47. Plaintiff has sustained damages as a result of Defendant's negligent misrepresentations.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant as follows:

A. An award of actual damages in an amount proven at trial;

B. An award of pre-judgment interest beginning January 1, 2014 through and until the date of final judgment, in accordance with R.C. 1343.03(A);

C. An award of post-judgment interest in accordance with 28 USC 1961;

D. An award of attorneys' fees and costs of this action; and

E. All other necessary and proper relief.

Dated: May 7, 2021

Respectfully submitted,

*/s/ Mark A. Whitt*
Mark A. Whitt
Lucas A. Fykes
**WHITT STURTEVANT LLP**
The KeyBank Building
88 East Broad Street, Suite 1590
Columbus, Ohio 43215
(614) 224-3911
whitt@whitt-sturtevant.com
fykes@whitt-sturtevant.com

*Attorneys for Plaintiff*