**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DIRECT ENERGY BUSINESS, LLC,
    Plaintiff,

    vs.

DUKE ENERGY OHIO, INC.,
    Defendant.

Case No. 1:21-cv-310

McFarland, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff Direct Energy Business, LLC ("Direct") alleges that defendant Duke Energy

Ohio, Inc. ("Duke") failed to report accurate electricity consumption data to the regional

transmission organization responsible for settling wholesale electricity transactions.  This matter

is before the Court on Duke's motion to dismiss the complaint (Doc. 10), Direct's memorandum

in opposition (Doc. 12), and Duke's reply memorandum (Doc. 15).

I. **Background**

A. **Facts Alleged[1]**

Energy distribution in Ohio is governed by a complicated collection of laws, regulations,

and agreements.  In this case, however, the facts alleged are relatively straightforward.

Duke exclusively provides electric distribution to electric load centers in a defined

territory.  Duke also sells electricity to retail consumers, but not exclusively.  In an effort to keep

electricity as affordable as possible, the Public Utility Commission of Ohio ("PUCO") certifies

competitive retail electric suppliers ("CRES") who also sell electricity to retail consumers in

Duke's distribution territory.  Direct is one such CRES.

---

[1] Unless otherwise specified, all factual allegations are taken from plaintiff's complaint (Doc. 1).

Direct, as a CRES, purchases electric generation service from a wholesale market operator, in this case PJM Interconnection, LLC ("PJM"), a regional transmission organization regulated by the Federal Energy Regulatory Commission ("FERC").  Direct then sells the purchased energy to retail customers.

Because Direct sells electricity to customers in Duke's exclusive distribution territory, Duke and Direct must coordinate.  In this case, Duke served as the meter-data-management agent ("MDMA") for Direct.  The relationship between Duke and Direct is fully described in two agreements:  (1) the Certified Supplier Agreement ("Supplier Agreement") (Doc. 1-1); and (2) the PUCO Certified Supplier Tariff ("Supplier Tariff") (Doc. 1-2).  Section 14.1 of the Supplier Tariff provides:

> 14.1    Meter Data Collection
>
> [Duke], acting as the designated Meter Data Management Agent for [Direct], will supply hourly load data to [PJM], for [Direct].  [Duke] will provide this data in accordance with the OATT,[2] including estimates when necessary.  [Duke] will be held harmless for any actions taken while performing Meter Data Management Agent responsibilities.  Meter data collected by [Duke] shall be used to calculate the quantity of energy actually consumed by [Direct]'s End-use Customers for a particular period.

(Doc. 1-2 at PAGEID 55) (footnote added).

In this case, then, Duke, as the MDMA, provided hourly load data to PJM.  PJM then used that data to settle wholesale transactions between and among Duke, Direct, and others, and issue invoices accordingly.

---

[2] The "OATT" is "PJM's Open Access Transmission Tariff, which is the open access transmission tariff on file with FERC [Federal Energy Regulatory Commission] and sets forth the rates, terms, and conditions of transmission service over transmission facilities located in the Transmission Provider's Balancing Authority Area, which includes the Duke Energy Ohio transmission System."  (Doc. 1-2 at PAGEID 27).  The OATT is more than 4,000 pages in length.  https://pjm.com/directory/merged-tariffs/oatt.pdf (last visited Oct. 29, 2021).

Prior to January 2013, SunCoke, a large industrial customer in Middletown, Ohio, received electric generation service from Duke.  SunCoke also generated electricity.  Because the metering configuration at SunCoke did not automatically "net" monthly generation and consumption, Duke manually performed the necessary calculations to provide accurate bills to SunCoke and accurate load data to PJM.

In January 2013, SunCoke switched from Duke to Direct for electric generation supply.  SunCoke continued to generate electricity as well.  As the MDMA, Duke remained responsible for metering SunCoke's usage and reporting hourly load data to PJM.  When SunCoke switched to Direct for electric generation service, Duke ceased performing the manual calculations necessary to net SunCoke's electricity production and electricity consumption.  As a result, Duke reported far higher usage to PJM than SunCoke actually consumed from January through July 2013.

"One of PJM's basic functions is to track who puts energy onto the grid, who takes it off, and how much net-buyers owe to net-sellers." (Doc. 12 at PAGEID 126).  PJM uses the consumption data Duke supplies "to issue invoices to Direct and other suppliers—payment is due on receipt, and PJM disburses the funds to the appropriate market participant." (*Id.*)

The OATT required Direct to pay PJM's invoices upon receipt, subject to the "resettlement" provisions contained in the OATT.  Direct successfully corrected the payments from March through July 2013 through the resettlement process.  However, due to the strict 60-day deadline for initiating resettlements, the January and February 2013 invoices have not been corrected.  Direct alleges that Duke's inaccurate meter load data for January and February 2013 caused Direct to overpay by approximately $1.6 million for wholesale energy charges.

3

### B.  Procedural History

In July 2014, Direct filed a complaint against Duke with the PUCO, alleging that Duke violated the Supplier Tariff by furnishing erroneous load data to PJM.  (PUCO Case No. 14-1277-EL-CSS).[3]  PUCO found in favor of Direct on April 10, 2019.  (Doc. 1 at PAGEID 6).  Duke appealed the PUCO decision, and the Supreme Court of Ohio reversed and remanded the case to the PUCO with instructions to dismiss Direct's complaint.  (*Id.*).  According to the Ohio Supreme Court, Duke acted as a meter-data-management agent in this case rather than as a public utility so the PUCO lacked jurisdiction under Ohio law.  *In re Complaint of Direct Energy Business, LLC v. Duke Energy Ohio, Inc.*, 162 N.E.2d 764, 769 (Ohio 2020).  PUCO formally dismissed the complaint in December 2020.

Direct then initiated this action.  According to Direct, Duke's failure to provide accurate load data to PJM or timely remedy the errors violated the Supplier Agreement.  (Doc. 1 at PAGEID 7).  Direct further alleges that Duke acted negligently in performing its duties under the OATT and Supplier Tariff and negligently misrepresented material facts to Direct regarding the need to net SunCoke's energy production and consumption.  (*Id.* at PAGEID 8-9).

Duke moved to dismiss Direct's complaint in its entirety.  (Doc. 10).  According to Duke, the Court must dismiss Direct's complaint because the FERC maintains exclusive jurisdiction over this dispute.  Duke further contends that Direct's claims are precluded by the hold harmless clause of the Supplier Tariff, and all claims are barred by the applicable statutes of limitation and/or the economic loss rule.  (Doc. 10 at PAGEID 89).

---

[3] The PUCO docket is accessible at http://dis.puc.state.oh.us/CaseRecord.aspx?CaseNo=14-1277&x=16&y=16 (last visited Oct. 27, 2021).

## II.  Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint

for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To

withstand a motion to dismiss, a complaint must comply with Rule 8(a), which requires "a short

and plain statement of the claim showing that the pleader is entitled to relief."  *Ashcroft v. Iqbal*,

556 U.S. 662, 677–78 (2009) (quoting Rule 8(a)).

A complaint must include sufficient facts to state a claim that is plausible on its face and

not speculative.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at

678.  Mere "labels and conclusions [or] a formulaic recitation of the elements of a cause of

action" will not suffice.  *Twombly*, 550 U.S. at 555.  A district court examining the sufficiency of

a complaint must accept well-pleaded facts as true, but not legal conclusions or legal conclusions

couched as factual allegations.  *Iqbal*, 556 U.S. at 678–79.

## III. Subject Matter Jurisdiction

"Considering whether jurisdiction to hear a case exists is the 'first and fundamental

question presented by every case brought to the federal courts.'"  *Metro Hydroelectric Co., LLC*

*v. Metro Parks*, 541 F.3d 605, 610 (6th Cir. 2008) (quoting *Caudill v. N. Am. Media Corp.*, 200

F.3d 914, 916 (6th Cir. 2000)).  As courts of limited jurisdiction, federal courts possess only the

power authorized in the Constitution or statutes.  *Id.*  Thus, the burden to establish jurisdiction

lies with the party asserting jurisdiction.  *Id.*

In this case, Direct asserts diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1)

because Direct is a citizen of Delaware and Pennsylvania, Duke is a citizen of Ohio, and the

amount in dispute exceeds $75,000. (Doc. 1 at PAGEID 1-2). Duke does not dispute these allegations.

Rather, Duke raises two closely related concepts: the filed rate doctrine and field preemption.[4] According to Duke, the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.*, "gives FERC exclusive jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce." (Doc. 10 at PAGEID 95 (quoting *AEP Texas N. Co. v. Texas Indus. Energy Consumers*, 473 F.3d 581, 584 (5th Cir. 2006)). "Under the FPA, Congress sought to protect energy markets and consumers (principally from monopolistic public utilities) by putting them under the governance of a commission of experts." *In re FirstEnergy Solutions Corp.*, 945 F.3d 431, 451 (6th Cir. 2019).

As the Sixth Circuit explained:

> The "filed-rate doctrine," as applied in the FPA, holds that FERC has plenary and exclusive jurisdiction over wholesale power rates, terms, and conditions of service for any such rate filed with FERC. *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371-72, 108 S.Ct. 2428, 101 L.Ed. 322 (1988). This is not limited to only "rates," but includes all contractual provisions, methodologies, restrictions, or any quantity or price terms. *Id.* Moreover, the filed-rate doctrine fully applies to energy contracts between private parties when those contracts are filed with and approved by FERC.

*In re FirstEnergy Solutions Corp.*, 945 F.3d at 443-44. Furthermore:

> [T]he Ninth and Seventh Circuits each stated flatly that "once filed with a federal agency, such tariffs are the equivalent of a federal regulation." The point of those opinions was that the parties' filing of the rate pursuant to federal law (here, the FPA) extinguished any state-court jurisdiction for breach of contract.

---

[4] "Because federal law exclusively occupies the field of matters relating to the transmission and sale at wholesale of electric enerby in interstate commerce, [plaintiff's] claims are barred by field preemption. . . . The filed rate doctrine is closely related to the doctrines of field preemption and conflict preemption in that judicial application of the filed rate doctrine is 'a matter of enforcing the Supremacy Clause.'" *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc*, No. 06-cv-0053-LRR, 2007 WL 2752075, at *8 (N.D. Iowa Sept. 18, 2007) (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 963 (1986)).

> So multiple courts have opined that filed contracts are not ordinary contracts and—in some sense—have the force of regulation or statute, at least insofar as to keep a district court or a state court from messing with them.

*Id.* at 445 (internal citations omitted).

The PJM OATT is a FERC-filed and approved contract. Direct correctly contends that the instant dispute does not directly question the filed rate. The issue, then, is whether Direct's claims implicate the OATT's contractual provisions and methodologies over which FERC has plenary and exclusive jurisdiction.

The filed-rate doctrine does not automatically bar federal court jurisdiction in all matters contained in a contract simply because the contract was filed and approved by FERC. *Id.* at 445-46 ("[W]e hold that the public necessity of available and functional bankruptcy relief is generally superior to the necessity of FERC's having complete or exclusive authority to regulate energy contracts and markets."). Indeed, "breach of contract claims which challenge FERC filed rates are preempted by the Federal Power Act, but not every legal dispute implicating a FERC filed agreement is converted 'into one over which the FERC exercises exclusive jurisdiction.'" *City of Osceola v. Entergy Arkansas, Inc.*, 791 F.3d 904, 908 (8th Cir. 2015) (quoting *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 913 (8th Cir. 2009)).

"FERC views pure questions of interpretation of FERC-approved contracts as falling within the jurisdiction of district courts," but not where the "relief sought would modify the terms" of the agreement. *Am. Muni. Power-Ohio, Inc. v. FirstEnergy Corp.*, No. 2:07-cv-577, 2008 WL 859032, at *4 (S.D. Ohio March 31, 2008) (discussing *Portland General Elec. Co. v. City of Glendale*, No. 05-1321-PK, 2007 WL 1655545 (D. Oregon June 1, 2007)). "FERC's exclusive jurisdiction extends over remedies for breach and non-performance of FERC-approved

operating agreements in the interstate wholesale electricity market." *Central Iowa Power Coop.*, 2007 WL 2752075, at *8.

The Ninth Circuit concluded that courts cannot "exert authority over the substantive provisions of a FERC-approved tariff" by seeking "to impose judicial remedies in addition to those that FERC may impose." *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 851–52 (9th Cir.), *amended on den. of reh'g*, 387 F.3d 966 (9th Cir. 2004).  To do so would "encroach upon authority entrusted exclusively to FERC by the FPA." *Id.* at 852.  The Sixth Circuit cited that Ninth Circuit decision in explaining that the filed rate doctrine "extinguished any state-court jurisdiction for breach of contract." *In re First Energy Solutions Corp.*, 945 F.3d at 445.

According to Direct's complaint in this matter, "[Direct] and PJM must rely on [Duke]'s meter data to accurately settle wholesale transactions and to ensure that retail customers are properly billed." (Doc. 1 at PAGEID 4).  Even though Duke allegedly provided inaccurate meter data to PJM, "the OATT required [Direct] to pay PJM's bills upon receipt, subject to the 'resettlement' provisions of the OATT." (*Id.* at PAGEID 5).  Direct "was able to partially mitigate its damages through a 'resettlement' provision specified in the OATT," but due to the "strict 60-day deadline for initiating resettlements" Direct could not resettle the January or February 2013 invoices.  (Doc. 1 at PAGEID 6).

Essentially, Direct alleges that the resettlement provisions under the FERC-approved PJM OATT are insufficient to compensate for Duke's alleged improper performance under section 14.1 of the Supplier Tariff (which specifically incorporates the OATT).  (Doc. 1-2 at PAGEID 55).  Direct seeks state common law relief that would impose additional penalties and payments outside the complicated resettlement process contained in the PJM OATT, Attachment K, section 3.6.  *See* https://pjm.com/directory/merged-tariffs/oatt.pdf at 3451-3453 (last visited

Oct. 29, 2021).  Because FERC's exclusive jurisdiction extends to remedies supplied by FERC-approved operating agreements in the interstate wholesale electricity market, Direct's claims are preempted as encroaching on the substantive remedial provisions of the OATT which is specifically incorporated into section 14.1 of the Supplier Tariff.[5]

## IV. Statutes of Limitation

Even if this Court could properly exercise jurisdiction in this case, Direct's claims are barred by the applicable statutes of limitation.  The parties agree that Ohio law imposes an eight-year statute of limitations on Direct's contract claim (count I) and a four-year statute of limitations for the remaining claims of negligence and negligent misrepresentation (counts II and III).  (Doc. 10 at PAGEID 102-03 and Doc. 12 at PAGEID 135).  The parties further agree that the unresolved invoices for which Direct allegedly overpaid were issued on February 7 and March 7, 2013.  (Doc. 1, Ex. C).  Direct initiated this action on May 7, 2021.  (Doc. 1).

In its motion to dismiss, Duke contends that Direct's cause of action accrued on March 7, 2013, the date on which the latest unresolved invoice became due.  (Doc. 10 at PAGEID 102).  Direct responds that "[e]ven if this were so (and it is not), none of Direct's claims are barred by the statute of limitations" because Ohio's savings statute, Ohio Rev. Code § 2305.19, extended the statutory filing period.  (Doc. 12 at PAGEID 134).

First, other than this parenthetical denial, Direct makes no argument that its cause of action accrued on any date other than March 7, 2013.  (Doc. 12 at PAGEID 134-35).  Generally, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

---

[5] Direct relies heavily on *Strategic Energy, LLC v. W. Mass. Elec. Co.*, 529 F. Supp. 2d 226 (D. Mass. 2008) in arguing that this Court should assert jurisdiction.  However, that case simply addressed whether a plaintiff must exhaust administrative remedies before filing suit.  It did not address issues of preemption or the filed rate doctrine.

argumentation, are deemed waived." *Strickland v. City of Detroit*, 995 F.3d 495, 511 (6th Cir.

2021) (quoting *United States v. Layne*, 192 F.3d 556, 566–67 (6th Cir. 1999)).

Second, Ohio's savings statute provides:

> In any action that is commenced or attempted to be commenced, if . . . the plaintiff
> fails otherwise than upon the merits, the plaintiff . . . may commence a new action
> within one year after the date of  . . . the plaintiff's failure otherwise than upon the
> merits or within the period of the original applicable statute of limitations,
> whichever occurs later.

Ohio Rev. Code § 2305.19(A).  As Ohio Revised Code § 2305.17 explains, "[a]n action is

commenced within the meaning of sections 2305.03 to 2305.22 . . .  by filing a petition in the

office of the clerk of the proper court together with a praecipe demanding that summons issue or

an affidavit for service by publication, if service is obtained within one year."

As the Ohio Supreme Court clarified:

> [Ohio Rule of Civil Procedure] 3(A) defines "commencement" in Ohio as "(1)
> filing a complaint with the court and (2) obtaining service within one year from the
> filing." It is apparent that the word "court," as used in Civ.R. 3(A) refers to an *Ohio*
> court, since Rule 1(A) provides that the Ohio Rules of Civil Procedure be limited
> to "courts of this state." Accordingly, the phrase "*commenced or attempted to be
> commenced*" contained in R.C. 2305.19 must be limited to actions before the courts
> of this state, *absent an express provision to the contrary*.

*Portee v. Cleveland Clinic Foundation*, 118 N.E.3d 214 (Ohio 2018) (quoting *Howard v. Allen*,

283 N.E.2d 167 (Ohio 1972) (second emphasis added in *Portee*)).  "The PUCO is not a court and

has no power to ascertain and determine legal rights and liabilities." *DiFranco v. FirstEnergy

Corp.*, 980 N.E.2d 996, 1001 (Ohio 2012).

According to the allegations in Direct's complaint, Direct seeks remuneration only for the

January and February 2013 invoices. (Doc. 1 at PAGEID 6).  Direct filed a complaint with the

PUCO in July 2014.  (*Id.*)  Direct prevailed in the PUCO action, but Duke appealed the PUCO's

decision to the Ohio Supreme Court.  (*Id.*)  On September 17, 2020, the Ohio Supreme Court

reversed the PUCO order and remanded the case to the PUCO with instructions to dismiss

Direct's complaint for lack of jurisdiction. (*Id.*)  Direct filed the complaint here on May 7, 2021.

(Doc. 1 at PAGEID 1).

The Court was unable to locate a single case in which the Ohio savings statute applied to

a complaint filed with the PUCO or other agency, and neither party identified such a case.

Because the PUCO is not a court, Direct did not "commence or attempt to commence" an action

within the meaning of Ohio's savings statute, R.C. 2305.19(A).  Thus, the savings statute does

not apply to extend the applicable limitations period.

According to exhibit C to the complaint, the invoices about which Direct complains were

due February 7 and March 7, 2013.  (Doc. 1 at PAGEID 68, 73).  Because Direct did not initiate

this action until May 7, 2021, this action is barred by the applicable eight-year and four-year

statutes of limitation.  Therefore, even if Direct's claims were not barred by the filed rate

doctrine, they should be dismissed as barred by Ohio's limitations period.


**IT IS THEREFORE RECOMMENDED THAT:**


 Defendant's motion to dismiss  (Doc. 10) be **GRANTED**.


Date:  _____11/15/2021_____

Karen L. Litkovitz
United States Magistrate Judge

11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DIRECT ENERGY BUSINESS, LLC,          Case No. 1:21-cv-310
    Plaintiff,                                       McFarland, J.
                                                         Litkovitz, M.J.
    vs.

DUKE ENERGY OHIO, INC.,
    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).